WILLIAM H. HUME, Respondent, v. THE MAYOR, Etc.,
OF THE CITY OF NEW YORK, Appellants.

*Municipal corporation — liability of, for damages occasioned by defective awnings in
street — its duty as to.*

Under the provisions of the Montgomerie charter and of chapter 86 of 1813, the
common council of the city of New York were authorized to pass ordinances
regulating the erection of awnings in the public streets, and an awning erected
in pursuance of, and in compliance with the provision thereof, is not an unlaw-
ful structure.

An ordinance required all awnings to be constructed in compliance with the pro-
visions thereof, and under the direction of the street commissioner. An awning
was constructed in substantial compliance with the ordinance, but without
the permission of the street commissioner. *Held,* that the fact that the awning
was allowed to remain undisturbed for a period of nearly seven years, without
any dissent on the part of that officer or of any of the other public authorities,
dispensed with the necessity of procuring the permission of the street commis-
sioner, and that the structure was a lawful one.

*Semble,* that where knowledge of the existence of unlawful structures in the pub-
lic streets is brought home to the corporate authorities, it is their duty to remove

the same, and in case of their failure so to do, the corporation is liable to a third person for the damages arising from an injury occasioned thereby.

An awning was erected by the occupant of a store in the city of New York, resting upon rafters, one end of which was supported by a rail sustained by a row of posts at the curbstone, the other being nailed to a cleat on the face of the building. Nearly seven years after its erection a portion of the awning, owing to an accumulation of snow thereon, fell and struck the plaintiff, who was standing thereunder. Shortly before the accident the post which supported the portion of the awning which fell had been struck and injured by a fire engine, but had thereafter been thoroughly repaired. Upon the trial it was insisted that the construction of the awning was negligent and defective; in that the ends of the rafters should have been fastened to the beams of the building, or have rested upon the cleat, instead of being simply nailed thereto.

*Held* (1), that the fact that the awning had proved itself capable of sustaining the burden to which it was subjected for nearly seven years, and had then yielded at a point where its strength had been impaired by an accident, was conclusive in favor of the security of its construction.

*Held*, further, that even if there were any defect in the construction of the awning, it was not of such a character as that negligence or carelessness could be imputed to the officers of the defendant for their failure to detect the same.

APPEAL from a judgment in favor of the plaintiff, entered upon the verdict of a jury.

*A. T. Regnier*, for the appellant.

*Edmund Randolph Robinson*, for the respondent.

DANIELS, J. :

The recovery in this action was for the damages caused to the plaintiff, by a personal injury produced by the falling of a portion of a wooden awning, erected on the corner of Fourth avenue and One Hundred and Twenty-fifth street, in the city of New York. The plaintiff stood under the awning awaiting the cars, on which it was his design to take passage, when the accident occurred. A very recent as well as heavy body of snow had fallen, and such a quantity of it rested upon the awning as to separate about ten feet of it from the building to which the inside of it had been attached, and precipitate it upon the plaintiff.

The awning was erected by the tenant of the building about the month of June, 1860, for the convenience of his business, which was that of a baker. The injury was occasioned to the plaintiff near

five o'clock in the afternoon, on the 22d day of February, 1867. The awning was sustained at the outside, near the curbstone of the street, by posts eight feet in hight and a rail running through those posts on which the rafters rested, which at the other end were attached by a cleat or a strip of board nailed to the building, at the hight of twelve feet from the sidewalk. These rafters were not made to rest upon the upper side of the cleat, but the ends of them were placed against it and supported there only by nails passing through the end of the rafters into the cleat by the process called toe-nailing, which was driving the nails obliquely through the side and near the end of the rafter into the cleat. The nails were stated to have been about an inch and a-half in length and to have passed through the cleat. The rafters at the outside rested upon, without being secured to, the rails extending through the posts, and on them was placed a covering of floor plank from the building for the distance of twelve or thirteen feet, leaving an open space beyond them of five or six feet to the rail passing through the posts. There were three posts on the Fourth avenue side, and two on the One Hundred and Twenty-fifth street side, and what was called a hip rafter at the corner, extending from the corner of the building to the rail between the last post on one street to the first one on the other street. The portion of the awning which fell was that extending from the last post on Fourth avenue to the first on One Hundred and Twenty-fifth street, and it all fell together by becoming separated from the building where the rafters had been nailed to the cleat. The nails are stated to have drawn out, which left this portion of the awning unsupported at the side of the building, and it fell at that end to the sidewalk without separating from the rafters.

It has been claimed that this was an unlawful incumbrance of the street, and that the defendant therefore became liable to the plaintiff for allowing its continuance, and the cases of *Congreve* v. *Smith* (18 N. Y., 79); *Knox* v. *Mayor, etc.* (55 Barb., 404), and *Irvin* v. *Wood* (4 Robertson, 138; affirmed 51 N. Y., 224) are relied upon as supporting that position. The second of these cases was a direct proceeding for the removal of the obstruction in the street, and the others were actions against the person by whose immediate instrumentality the unlawful object had been placed in it; and they con-

tain nothing warranting the conclusion that the defendant would become chargeable with liability for injuries sustained, merely because of the existence in or over a street of the city of an unlawful obstruction or an unsafe erection. The rule creating corporate liability must be very much the same in all cases, where the cause of the injury is produced by the act of a third person. And if the object unlawfully placed upon or over the highway has been so long continued as to charge the municipality with knowledge of its existence, it may very well be that in such a case as that it would become liable for neglecting to interpose the proper authority for its removal. The existence of an unlawful structure known to be so by the public authorities would probably create such a duty for its removal, as to render the corporation liable for the consequences of an injury, result from neglecting to perform it. For that reason, as the awning in this instance was uninterruptedly maintained for a period of about seven years, and its existence must have become known to the corporate officers charged with the care and safety of the streets, it will become necessary to determine whether it was, as it has been claimed to have been, an unlawful structure.

It was conceded upon the trial, that both these streets were laid out by the commissioners appointed under chapter 115 of the Laws of 1807, and that the land was acquired for them and the streets opened, pursuant to the provisions of chapter 86 of the Laws of 1813 (Vol. 2, R. L., p. 342), and by the terms of that act, the title so obtained was secured for the purpose that the land should be appropriated and kept open, for or as part of a public street, avenue, square, or place forever, in like manner as the other public streets, avenues, squares and places in the said city are, and of right ought to be. (Vol. 1, R. L., 1813, 414.) And as to such streets, and all others in the city, it was declared and provided further : " That the mayor, aldermen and commonalty of the city of New York, in common council convened, and their successors, shall continue to be commissioners, to regulate and to keep in repair the present roads or highways and to regulate and keep in repair such other public roads or highways as shall hereafter be laid out or opened in the said city and county. (Idem 423, § 193.) And in both respects this was no more than a substantial repetition of previous charters and acts, relating to the

city of New York. The common council was not only required to preserve and keep the streets in repair, but they were also to regulate them, and that could only be done by the adoption of suitable and proper regulations and ordinances for that purpose. There was no restraint or limit placed upon this authority, other than that which was to be implied from the coincident obligation of keeping the streets themselves in order and free from obstruction, for the safe and convenient use of persons having occasion to pass over them. That, of course, was the paramount object of maintaining them, and to promote it, and at the same time subject to it, the common council was invested with complete authority to regulate them by means of its ordinances. This was amply provided by the section of the act of 1813 already mentioned, and by another still more general provision made by section fourteen of the Montgomerie charter.

Pursuant to this authority an ordinance was enacted, before the erection of the awning by which the plaintiff was injured, regulating the manner of their construction, and that continued in force at the time of such injury. (Vol. 1, Laws of 1857, 885, § 32.) By that it was provided that all posts fixed in any street for the purpose of supporting any awning, shall not exceed nine inches in diameter, and the rail crossing the same shall not exceed seven inches in width or hight, and four inches in thickness; the said posts shall be placed next to and along the inside of the curbstone, and the upper side of the rail which is intended to support the awning shall not be less than eight feet nor over ten feet in hight above the sidewalk, and the cross-rail shall be strongly morticed through the upright post. (Chap. 24, title 2, § 23, of ordinances of 1845; chap 24, § 15, ordinances of 1859.) This ordinance, by a clear implication, allowed the owners and occupants of buildings the liberty to promote their convenience by erecting awnings over the sidewalks, and the only restraint placed upon its enjoyment was contained in the next section, which provided that it should be done under the direction of the street commissioner, and be made conformable to the section preceding it, which has been quoted at large. Other provisions were also made upon the same subject, by which awnings with iron brackets were prescribed for streets not exceeding the width of forty feet, and with iron posts and cross-

rails in streets of a greater width than that, in case the wooden awning posts in the latter streets had been or should be directed to be removed. But as neither of these streets appeared to be of a less width than forty feet, and no directions for the removal of the wooden posts had been given, these provisions do not require special consideration in the disposition of this case. The awning in controversy was controlled by the two sections of the ordinances first referred to, and under them it would clearly have been a lawful structure, if it had been erected under the direction of the street commissioner.

It was within the power given to the common council for the regulations of the streets, and was erected according to the plan devised by the ordinance. But that was done, as the evidence showed, without any permission from the street commissioner. It was not constructed under the direction of the street commissioner, as it should have been. But as it was allowed to remain in front of the occupant's premises for a period of nearly seven years without any dissent on the part of that officer, or any other municipal official, it may be presumed from that circumstance to have received his approbation, and that would be legally equivalent to the direction rendered necessary by the terms of the ordinance. (*Palmer* v. *Yates*, 3 Sand., 138.) But if constructed according to the plan of the ordinance, without that being done under the direction of the street commissioner, it was not declared to be unlawful or subject to subsequent removal merely on that account. The consequence of the default was declared to be, that the person failing to secure the direction should be liable to a penalty of ten dollars for the offense committed, and even that does not appear to have been ever insisted upon in this instance. After its erection the awning was permitted to stand as it had been placed in front of the occupant's premises, without any objection on the part of the public authorities, and that sufficiently dispensed with the failure to procure the requisite direction to render the structure a lawful one. The form of its erection was substantially that which the ordinance had devised and declared, except, perhaps, in the mere location of the posts, which were not as near the curbing as was specified, and as that was its condition, the mere want of the direction prescribed was not a very important circumstance. It did

not diminish its stability or security, and if that direction had been literally obtained it would not have protected the plaintiff from the injury sustained by him.. It was a circumstance simply affecting the occupant's relations to the authorities of the city, and if the defendant did not complaint of or dissent from the omission, persons having the right to the use of the streets could derive no advantage from it. As it substantially conformed to the ordinance, the occupant merely incurred a liability for the prescribed penalty by his failure to secure the official direction, and whether that should be enforced against him was solely a matter for the defendant's determination. It was not required to be constructed of different material, because the wooden posts had never been directed to be removed, and such a direction in these streets was necessary before the awning could be required to be replaced by iron. There was nothing in the case from which the awning could be regarded as an unlawful structure. For that reason *Trenor* v. *Jackson* (15 Abb. [N. S.], 115) does not apply to it. On the contrary, its erection and maintenance were sanctioned by the ordinance which the common council of the city, under its authority over the streets, and for the purpose of regulating their use and enjoyment, had complete power to enact.

It was further objected upon the trial that the mode adopted for securing the attachment of the rafters to the cleat was an improper and insecure one, and that it had remained so long in that condition that the defendant was chargeable with knowledge of its defects in that respect. That they might have been more securely attached to the building was made entirely clear by the evidence. That could have been done by securing them to the timbers of the building instead of the cleat, which was itself only nailed to the boards, or by placing them against the building so that their under sides would have rested upon the cleat. But it does not follow from the fact that they could have been rendered more secure, that the mode of construction which was adopted was unsafe. The ordinances of the city prescribed no mode for securing the rafters of the awning to the building; that was left to the judgment and skill of the person engaged in constructing it, and probably upon the supposition that his interest and the security of his customers would be sufficient to insure safety in that respect. The evidence given by

the plaintiff's witnesses, tended to show that this had not been done in the construction of this awning, while that of the defendant's witnesses was in direct conflict with that conclusion. If the case depended upon which opinion was the correct one, this state of the proof would render it a very proper one for the decision of the jury. But it did not, for the fact that the awning itself had proved sufficient to resist the pressure it had been obliged to sustain for a period of about seven years, and then only yielded at the point where its strength had been impaired by the collision of a fire engine, was conclusive in favor of the security of its construction. The snow with which it had become loaded at the time when it fell, was shown not to have been unprecedented in weight or quantity, and in all but the portion which gave way, it seemed to be entirely adequate to the burthen it had to support. A structure capable of that degree of endurance could not be held to have been either negligently or unskillfully made; and the defendant was not negligent or careless in not discovering its infirmity, if, in truth, it had any, in this respect. Its officers were not bound to scrutinize the manner of the attachment of the rafters with the skill and discrimination of an expert. That was held by the Court of Appeals when this case was before that tribunal. (*Hume* v. *Mayor*, etc., 47 N. Y., 639.) But what their officers were bound to exercise in their observations was, that degree of care that reasonably prudent persons bestow upon their own affairs. They were obliged to exercise ordinary care and skill in that respect, and in its observance they could not be chargeable with any default, because they did not conclude that this mode of attaching the rafters was a proper one, when the facts were before them that it had proved sufficient for the support of the awning for so long a period of time, and had adequately sustained the burthens it had been required to bear. The inference which would ordinarily be drawn would be that the structure was reasonably secure, and it would be justified by the fact that it fully and safely answered the purposes of its erection. The defendant's officers were bound to nothing beyond that in this respect, and cannot be held to have been in any legal default, for failing to discover that some more secure mode of attaching the rafters would have been better or more advisable. A mechanic reasonably competent had been selected to perform the work, and

he did it as he deemed that to be proper; its subsequent history confirmed the propriety of the course he had adopted; and, under the circumstances, the defendant could not be affirmed to have been careless or negligent because its officers failed to insist upon a change, that would have rendered the structure secure beyond a possible contingency. Ordinary care upon their part required no such unerring scrutiny or skill, and if it had, the injury sustained by the plaintiff did not result from the want of it.

The evidence of the plaintiff's witnesses, which was the most favorable to his case, showed that observation was necessary to discover the manner in which the rafters were placed against and secured to the cleat, and from that it was supposed that the observer would conclude that it was an improper and dangerous mode of construction. But while the fact could undoubtedly have been seen, this conclusion would not under the circumstances, necessarily or even reasonably have resulted from it. It would rather be inferred from the stability indicated by the continuance of the structure, that it had been so securely nailed to the cleat as to render it free from danger. Indeed that would have been the the only proper conclusion to be drawn, as long as there was nothing which could indicate to a simple observer that it had not been so secured. How much nailing that would require, or whether in fact it had been done, could only be ascertained by a closer examination than ordinary care would require to be bestowed. The defect mentioned by the witnesses, which would be discovered by merely looking at it, was in the plan of construction, not in the manner in which the work itself had been performed. If the jury could have inferred that both were in fact improper, they could only do so by looking at it with the eyes of experts, and that required a degree of skill and attention the defendant was not bound through its officers to exercise; even that was not in all instances effectual, for it appeared by the evidence of one witness familiar with the construction of awnings, that he passed under this one every morning for about three years, without discovering that it was in any way dangerous from the mode adopted for the construction.

It appeared by the evidence, that the portion of the awning extending from the last post on Fourth avenue to One Hundred

and Twenty-fifth street, was the part which fell and it went down in one mass, without separating.

This was on the 22d day of February, 1867. In the preceding September or October, a fire engine had collided with the post on Fourth avenue, which wrenched the rail from it running from that post to the first one on One Hundred and Twenty-fifth street. The foreman of the company directed the occupant of the building to have the injury repaired at his expense, and the occupant's evidence, which was in no way contradicted or discredited, showed that he immediately employed a carpenter to repair it. He directed him to repair and make it as good as it had previously been. And he repaired it by restoring the rail to its proper condition, and did nothing more than that. But when the work was completed there was nothing to show that it had not been completely repaired. Neither this witness nor any other examined in the case appears to have discovered any thing in the appearance of the awning, after the repair had been made, which indicated that this portion was not equally as sound, as the portions that had not been injured by the collision. But that was very clearly not the fact. If it had been, it is not probable that it would have fallen as it did. The probability is that when the post was wrenched, the attachment of the rafters to the cleat was disturbed and weakened, and that it fell in consequence of its impaired strength at that point. After the accident the nails that had passed from the rafters into the cleat were discovered to be rusty, and seemed to have been drawn out. But no evidence was given tending to show that any notice or knowledge of this injury had been received by the defendant or any of its officers, or of the fact that it had been imperfectly repaired; neither was it shown that the awning itself in any way indicated by its appearance, that the work of repairing it had not been thoroughly done. These were the causes of its inability to maintain the weight of the snow upon it, and which consequently, by its fall, produced the injury sustained by the plaintiff, and as to neither was any fault or omission shown affecting the defendant. If these causes had not intervened, there is not the slightest reason for supposing that this part of the awning would not have been equally as capable of sustaining the pressure upon it, as the residue of it did, and as this portion had previ-

ously done, when similar loads of snow had previously been deposited upon it, and as to them the defendant had no actual notice, and there was no such visible indication of their existence as would charge it with constructive notice.

It appeared that the colliding engine was the property of the city, but that circumstance was not sufficient to render the defendant liable for the depredations produced by its heedless or careless management by those in charge of it. Municipal corporations have often been held liable for injurious consequences resulting to persons, by reason of the unsafe condition of their streets; but ordinarily, the liability has been a qualified one, depending on the want of that care and skill which, under the circumstances, was reasonably required to protect persons lawfully using them, against the risk of accident. The dangers to be guarded against have usually been of an observable and visible nature, and the corporation has appeared to have neglected to guard or remove them, after actual or constructive notice of their existence. A violation of its duty to the public has been shown as the foundation of the liability. Where that has not been made to appear, and no actual wrong has been shown on the part of the corporation or its officers, the right to recover damages for personal injuries has not been maintained, except by force of positive statutory provisions imposing an unqualified degree of responsibility. A statute of this description has existed in the State of Massachusetts, rendering the municipality liable for the consequences of a dangerous object in or about a highway, after it has continued for the period of twenty-four hours, and under that a liability for injuries has been created upon facts similar to those shown to have existed in this case. (*Drake* v. *City of Lowell*, 13 Met., 292 ; *Day* v. *Milford*, 5 Allen, 98.)

But even under that statute, the court declined to hold a city liable for an injury produced by the falling of a sign insecurely suspended by an iron rod, projecting from a building over the sidewalk. (*Jones* v. *City of Boston*, 104 Mass., 75.) As the liability could not be maintained by the force of the statute, the action failed because the common law did not sustain it upon the facts. A similar conclusion was declared in the case of *Hewison* v. *New Haven* (34 Conn., 136), where it was held that the city was not liable to a person injured by a weight, falling from the corner of a

flag suspended over the street. No such statute exists in this State, and consequently the principle of the common law has been alone applied to this class of cases, and that requires that neglect or want of proper care shall be shown in guarding or removing dangerous obstructions in the public streets, after actual or constructive notice of their existence, before the municipality can be held liable for personal injuries sustained by means of them. It is a principle which has been often invoked, and uniformly applied in all cases where neither the municipality itself nor any of its officers has had any agency in creating the obstruction producing the injury. But negligence has been shown in omitting to guard or remove it. (*James* v. *New Haven*, 34 Conn., 1; *French* v. *Brunswick*, 21 Me., 29; *Grove* v. *Fort Wayne*, 45 Ind., 429; *Mayor* v. *Sheffield*, 4 Wall., 189; *Coggswell* v. *Lexington*, 4 Cush., 307; *Hutson* v. *Mayor*, 5 Seld., 163; *Griffen* v. *Same*, id., 456; *Requa* v. *City of Rochester*, 45 N. Y., 130; *Todd* v. *The City of Troy*, 61 id., 506.)

But it does not sustain the plaintiff's action because the imperfect structure was not erected by the defendant, or under its authority, and nothing appeared from which it can be held that its officers were in default, for not knowing or observing the existence of its imperfection. The case was not one which should have been submitted to the jury, and the Court of Appeals, in its decision in it, did not require that to be done, as there was no evidence showing that the defendant had negligently allowed the awning to remain projected over the sidewalk, before or after the collision by which it had been rendered unsafe, and it appeared at all times to have been in a reasonably secure condition. The case is one decidedly appealing to the sympathies, but that can afford no justification for the allowance of a recovery which, upon the evidence, cannot be founded upon the well established legal principles applicable to it. The judgment should be reversed and a new trial directed, with costs to abide the event.

Davis, P. J., concurred; Brady, J., dissented.

Judgment reversed and new trial ordered, costs to abide event.